STATE OF CONNECTICUT *v.* EDWARD McNALLY

STATE OF CONNECTICUT *v.* RICHARD McALISTER

REVIEW DIVISION OF THE SUPERIOR COURT

Decided December 30, 1965

*Harry H. Hefferan, Jr.,* of Norwalk, for defendant McNally.

*Warren A. Luedecker,* of Bridgeport, for defendant McAlister.

*Otto J. Saur,* state's attorney, for the state.

By THE DIVISION. In an indictment on April 16, 1964, the grand jury charged each defendant with the crime of murder in the first degree for the fatal shooting and stabbing of Edwin McAlister, father of the defendant McAlister, on August 28, 1963, in violation of § 53-9 of the General Statutes. In a separate indictment on April 16, 1964, the grand jury also charged each defendant with the crime of murder in the first degree for the fatal shooting of John Shinners on February 23, 1964, while the defendants were perpetrating a robbery, also in violation of § 53-9. The defendant McNally was born on June 5, 1946, and the defendant McAlister was born on November 15, 1946. Accordingly, McNally was seventeen years old at the time of each crime, while McAlister was sixteen at the time of the murder of his father and seventeen at the time of the Shinners murder.

With the acquiescence of the state, a plea of guilty to murder in the second degree to each of the crimes charged by the grand jury was accepted by the court. The court sentenced each defendant to life imprisonment in the state prison for each of the murders and directed that the sentences run con-

secutively. The defendants appealed to our Supreme Court on the ground that the sentencing court did not have the legal right to impose consecutive life sentences, and the Supreme Court upheld the imposition of consecutive life sentences as within the authority of the court. *State* v. *McNally,* 152 Conn. 598.

By reason of the court's direction that the mandatory life sentences be served consecutively, these defendants will not be eligible for parole under General Statutes § 54-125 until they have served a minimum of forty years. The sole purpose of the applications for review in these cases is to request the Review Division to order the mandatory life sentences to be served concurrently, so that the defendants will be eligible for parole after serving twenty years in prison. General Statutes § 51-196 provides that the Review Division "may order such different sentence or sentences . . . as could have been imposed at the time of the imposition of the sentence under review." As the sentencing court could have imposed concurrent life sentences; *State* v. *McNally,* supra, 600; it follows that this Review Division has the undoubted power to do. Accordingly, the issue before us in each case is whether under all of the circumstances we should order the mandatory life sentences to be served concurrently, or whether we should order the consecutive life sentences imposed by the court to stand.

The facts are as follows. The defendant McAlister's mother died on April 18, 1963, as a result of a cerebral hemorrhage. Defendant McAlister believed his father was responsible for her death. He had previously disliked his father, and after the death of his mother he developed strong feelings of hate for his father and decided to get rid of him. He disclosed this intention to the defendant McNally,

his friend, who had been staying with the McAlister family. The younger McAlister child, Roger, then seven years of age, was informed of the plan to kill the father and had no objection. On two occasions within a week before the father actually was killed, defendant McAlister attempted to do away with him. On the first occasion, he mixed weed killer and/or Drano, which defendant McNally secured from the garage, with coffee which the father drank, causing him to become ill. About three days later, defendant McAlister cooked some chicken and lima beans in a similar concoction. This also made the father ill. It was then decided to kill the father upon his return from work the following night.

The next evening, that of August 29, 1963, the defendants positioned themselves in the McAlister living room with the curtains drawn and the house in complete darkness except for a light in the garage. Both defendants were armed. McNally had a .22 caliber rifle and McAlister had a six by one-half inch switchblade knife. At about 9:45 p.m., the defendant McAlister's father entered the darkened living room from the garage. As he was silhouetted against the lighted doorway, defendant McNally shot the elder McAlister, who fell to the floor. Defendant McAlister then plunged his knife into his father's chest six or seven times. The father moaned, and said, "Oh, God, no more, Rich, no more." At this point defendant McNally walked over to the father and shot him in the head. The defendants wrapped the father's body in blankets and placed it in the family station wagon. Thereupon, with defendant McAlister driving, and defendant McNally and young Roger McAlister in the vehicle, they rode around Wilton, Westport, Norwalk, New Canaan and Redding for two to three hours looking for a suitable place to get rid of the body. On a dirt road in Redding the defendants half lifted and half

dragged the body into a drainage ditch, and, while Roger McAlister watched, they threw flat rocks, dirt and leaves over the blanket-covered and rope-tied body until it was concealed. Defendant McAlister took his father's wallet containing $29 and papers. They then returned to the McAlister home, where they cleaned up the blood on the floor with towels and gasoline. All of the bloody cloths were placed in two pillowcases and placed in a closet. They went to bed around 5 a.m. They awakened about 10 a.m., brought the pillowcases and contents to the backyard, poured gasoline on them, and then burned them. Defendant McAlister telephoned his father's employer and said that his father would be in Texas for about three weeks because of a death in the family.

The state police carried on an investigation in regard to the missing elder McAlister, and the defendants began to believe that the investigating state trooper was suspicious of them, so they decided to get out of town, for which purpose they needed a car, and they looked around on Saturday evening, February 22, 1964, for a suitable one to steal, but were not successful. The next morning defendant McAlister thought of a 1963 Chevrolet owned by John Shinners, a contemporary of the defendants, and they decided to kill John Shinners to get possession of his car. Defendant McAlister telephoned Shinners on Sunday, February 23, 1964, from the McNally home and requested his assistance in recovering two bottles of liquor which he told Shinners was hidden in the woods in North Wilton. Shinners agreed to help, and drove his car to the McNally home at about 12:30 p.m. Before the defendants and Shinners drove away in the car, McAlister tucked a loaded gun belonging to McNally in his belt. They drove into the woods to an isolated spot near a reservoir, where they parked the car, and started to

walk along a snow-covered woodland trail for about one-half mile. McAlister dropped back about five or six feet, drew the gun he was carrying, and shot Shinners. This first shot entered near the right kidney. Shinners spun around and said, "Rich, what are you doing?" McAlister then shot him in the chest, and when Shinners hit the ground McAlister emptied the remaining four bullets into him. McAlister then removed Shinners' wallet and car keys, which he delivered to McNally. He obtained bullets from McNally with which he reloaded the gun. McAlister then returned to Shinners and shot him two or three more times to be certain he was dead.

They left Shinners' body lying on the ground and drove off in his car, which they parked behind a grocery store after removing the keys and wiping off their fingerprints. At this time McAlister was living with Mr. and Mrs. Donald Dougherty. About 7:30 p.m., McAlister obtained permission to go out to meet McNally. Before leaving the Dougherty home, he stole an automatic pistol owned by Mr. Dougherty and took $10 from Mrs. Dougherty's dresser. They drove around for a while in Shinners' car, trying to find registration plates to steal, but were unsuccessful. Later in the evening, the defendants heard on the car radio that Shinners' body had been found. They then abandoned the car in a private driveway in Westport and fled. The car was discovered the following morning. They spent the remainder of their time until they were arrested on Friday, February 28, 1964, breaking into unoccupied homes where they slept and obtained food. On Thursday evening, February 27, 1964, they broke into the Gordon Conley home in Wilton while the Conley family was away. Neighbors checking the house for the Conleys were surprised and confronted by the defendants, who pointed guns at them and ordered them into the cellar, where they were or-

dered to stay for ten minutes or they would get "plugged." The defendants were apprehended by police officers the next day and were taken into custody at gunpoint.

At the time of sentencing, the court said: "Considering the absence of any extenuating circumstances surrounding these two murders, other than the age of each accused, and in view of the fact that any person having been in confinement under sentence for life and has served twenty years may be eligible for parole, the court has decided to impose consecutive sentences on the indictments in each case. The court is doing this to convey to the board of parole not only the lack of any legal justification for the actions of the accused, but because of the doubt in the court's mind that they will ever be able to respond to the treatments suggested by the psychiatrists and physicians who furnished material to both counsel and to the adult probation commission . . . . In the case of McAlister, unless his deep-seated and serious personality disturbance can be corrected, he will never be a reasonable risk away from an institution. Although McNally does not possess the same antisocial impulses as McAlister, he is at this particular period of time just as dangerous as McAlister . . . ; the material examined by the court reveals that it is extremely doubtful whether McNally's mental disorder can ever be corrected or controlled from exhibiting itself in the future." The court further stated: "The consecutive sentences are being imposed because the court at this time has concluded that neither accused will ever be restored mentally to such an extent that his presence in society will not create a dangerous risk."

The Supreme Court held in respect to these cases that "the court could also take into account the operative effect of the parole laws so far as they might

have a bearing on the determination of a proper sentence under all of the relevant facts and circumstances.  See 41 C.J.S., Homicide, § 436." *State* v. *McNally,* supra, 602.

This Review Division shares the fear of the trial court that the defendants may never be fit persons entitled to go at large in our society without creating a dangerous risk which society should not be required to undergo.  At this time we do not believe that either of the defendants should have the right to apply for release on parole after twenty-five years, or after twenty years with maximum credit for good conduct in prison, pursuant to § 54-125 of the General Statutes.

We therefore find that the sentences imposed herein are just and proper, and should stand.

We feel constrained to add that if either defendant does in fact respond to medical and psychiatric treatment to the extent that he might be a proper subject for parole in twenty or more years, it will be within the jurisdiction of the board of pardons by virtue of the provisions of § 18-26 of the General Statutes to afford him relief from the burden of the sentence imposed upon him.  Such action must await the future that men cannot now see.

MEYERS, PALMER and HEALEY, Js., participated in this decision.